285 P.2d 1114

Raymond S. KING, Plaintiff and Appellant,

v.

Howard FIRM and Paul J. Cox, Defendants and Respondents.

No. 8201.

Supreme Court of Utah.

July 15, 1955.

Rawlings, Wallace, Roberts & Black, Dwight L. King, Salt Lake City, for appellant.

Grover A. Giles, Salt Lake City, for respondents.

WADE, Justice.

Raymond S. King, plaintiff and appellant herein, commenced this action for damages for an unlawful eviction from leased business premises and for conversion of personal property. This appeal is from a judgment adverse to him and in favor of defendants and respondents on their counterclaim for rent.

The undisputed facts are that in the summer of 1950, King induced Firm who operated a grocery store in Springdale, Utah, at the mouth of Zion's Canyon to add soft ice cream to the other products he sold. Because of an insufficient water supply in Springdale the operation of the soft ice cream machine was not as satisfactory as it should have been. It was decided thereafter to build and lease to King a separate building across the road from the grocery store on land also owned by Firm and Cox in which to sell soft ice cream and other refreshments. King obtained photographs of the type of building he thought would be suitable and the construction of it was commenced in the spring of 1951 with the supervision and help of King. King also advanced defendants $1,800 secured by a note and mortgage. Although the building was not sufficiently finished for occupancy before July 1, 1951, a lease prepared by King's attorney and dated May 1, 1951, was executed on June 18, 1951. This lease provided that the building was to be used for "the purpose of conducting a refreshment business, furnishing sandwiches, hot dogs, soft drinks, beer, candy, cigarettes and novelties," and that the lessors would furnish sufficient water for the operation of lessee's business. The rent for the premises was at the rate of $50 per month payable monthly in advance during the summer months of May to October for each year of the term which was to run for 6 years, or in lieu of that rental the lessee could pay 5% of all *gross* sales of the business and pay "on the first day of each and every month during such periods as above stated." Because the building was not finished and therefore King did not obtain possession of it until the first part of July, Firm agreed that King would only have to pay rent on *net* profits for the first year of operation. The lease further provided that if the rent should remain unpaid for a period of 20 days after it should become due or if default were made in any of the covenants by lessee it would be lawful for lessors to re-enter and take possession of the premises without notice or legal process. Respondents caused a well to be dug to augment the inadequate water supply furnished by Springdale but this well was abandoned that same year when the water level of the river which supplied it became too low. As a result, although there was enough water supplied to operate a refreshment business there was insufficient to run the soft ice cream machinery and King was forced to install an air cooler for that purpose.

Respondents having failed to make payments as they became due on the $1,800

note and mortgage date September 1, 1951, King inquired of the cause thereof and was informed that the payments could not be made as soon as contracted for and it was arranged to take another note and mortgage in lieu of the first note and mortgage. The new note and mortgage which were signed by the signers of the original note and mortgage but not by Firm's wife, (who refused to sign) Firm having married in the meantime, were signed on March 1, 1952. These were for the face value of $2,146 of which the sum of $346 represented the amount due for costs and equipment for which respondents had promised to pay before they executed the new instruments. Later respondents denied that they had promised to pay for all the items included in that sum but the court found they owed that sum. King testified that friction having developed between King and respondents, Cox requested him to give up the lease, which he refused to do. When Mr. Firm asked King for rent, King responded that their agreement was that the rent would be 5% of the net and there was no net, therefore no rent was due or owing. The evidence showed there was a misunderstanding as to what was meant by the first year of operations, whether twelve months beginning from the date Mr. King took possession or the season of May through October as apparently contemplated in the lease. This misunderstanding was resolved in favor of respondents by the court. Respondents and King met on June 16, 1952, to discuss their problems and Cox told King that items had been included in their debt evidenced in the March, 1952, instruments for which respondents did not consider themselves liable and that they wanted an accounting of his business so that they would know how much was due them for rent. King responded that he did not have the books with him at the time and suggested that the debt was past due, whereupon Cox said he would pay it. The parties then figured that with the principal and interest due on the $1800 note and mortgage plus the sum of $25 for attorney's fee for unused papers, (it being conceded the only unused papers were the renewal note and mortgage dated March 1, 1952,) there was owing $1,967.50 which amount was paid to King and he released the note and mortgage of September 1, 1951, i. e., the $1,800 note and mortgage. At the time this payment was made Cox was under the mistaken impression that Mrs. Firm was in possession of the later note and mortgage representing the same debt he paid and some additional items, and he did not know it was in Mr. King's possession until the time of the trial of this case. Mr. King testified he held it for the balance due him and that he considered it at least evidence of such a sum being due him. The court found that the June 16th payment was made on the $2,146 note and mortgage and that there remained a balance owing thereon of $346 which was not yet due.

King failed to make any accounting (although he testified he had offered to show Firm the books but Firm had not thought

it necessary) or to pay any rent and on July 26, 1952, he was served with a notice of termination of the lease for failure to pay the monthly rental reserved therein. On August 19, an accounting and a tender of a check for $100 were made on behalf of King to respondents, which tender was refused and on August 23, during King's absence respondents requested his employee to leave and padlocked the place. When King returned he requested permission to enter the building to remove some personal belongings but was refused. Respondents later operated the business themselves.

King introduced in evidence his account books which showed the gross profits for the period he operated the business during the 1952 season and the court found that he owed $242.25 as rent and granted respondents a judgment for that amount plus interest and a lien on King's property in the building should he fail to pay the judgment and refused to allow King's claim for the amount due him because the court found that it was not due at the time of the trial.

It is King's contention that the evidence cannot sustain the court's finding that the second note and mortgage were valid and subsisting instruments and that the balance of $346 was still owing but not due. He contends the evidence conclusively proves that the sum of $346 was due and owing on an open account and was a proper set-off for any rent which might have been due, and therefore the termination of the lease and his eviction were unlawful and he is entitled to damages and a judgment for conversion of his property.

We agree that the evidence is conclusive that none of the parties to the second note and mortgage considered them to be valid and subsisting instruments. Had they so considered them, King would not have charged respondents the attorney's fee for those instruments because they had been prepared at the request of respondents and had not been used. Had the parties considered that the second note and mortgage, which was never recorded, were valid and subsisting instruments they would not have been described in the release by King of first note and mortgage, the debt of which the later instruments were supposed to have renewed, as "unused papers." The fact that the release was of the first note and mortgage and not the second after it was decided to pay off the debt they represented is further evidence of the intent and understanding of all the parties that the second note and mortgage were not valid instruments. The mortgage being unrecorded and there being no question of third parties' rights here, there appears no logical reason why the parties could not mutually agree that those instruments, if valid in the first instance, should be cancelled or rescinded just as they would have been able to do in the case of an ordinary contractual obligation. See 12 Am.Jur., Contracts, Sec. 442, page 1024, where it is stated:

"It is sometimes said that a contract is considered to remain in force until

it is rescinded by mutual consent or until the opposite party does some act inconsistent with the duty imposed upon him by the contract, which amounts to an abandonment, or that a contract will be treated as abandoned where the acts of one party inconsistent with its existence, are acquiesced in by the other. * * * "

King by releasing the first mortgage and writing thereon that the sum paid included interest and payment of an attorney's fee for "unused papers" acted in a manner inconsistent with the existence of any rights under the second note and mortgage and thereby showed that he had abandoned any such rights which he may have had, and certainly the other parties acquiesced in this. We conclude therefore that the parties by their acts having mutually consented to abandonment of any rights under the later instruments, the court erred in finding that the balance of $346 was owing under those instruments and therefore was not yet due. However, even though disputed by respondents, the evidence was sufficient, aside from its inclusion in the second note and mortgage, for the court's finding that such a sum was owing to King, it not being denied that an account for such amount had been presented to and approved by Firm before its inclusion in the later note and mortgage. This being so, the judgment should have included an award to King for $346.

Appellant, however, argues that this amount being due on an open account permitted him to set it off against his rent payments as they became due and hence his lease was not forfeited by reason of his breach in failing to make the rent payments. Even though he is entitled to a judgment in the present action for the sum owing him by respondents, the debt will not excuse performance of his contract. See Vol. 3, Williston on Contracts, Rev. Ed., Sec. 887F and numerous cases cited under Notes 4 and 5 where the author states:

"* * * Where rent is due under a lease, the tenant must pay the rent even though he has been obliged to spend money on repairs which the landlord has covenanted to make. It is true that if sued for rent he would in most jurisdictions now be allowed to recoup or counterclaim the damages due from the landlord, but the landlord may not merely sue for the rent. If the lease or statute, as is usually the case allows a landlord to eject a tenant for non-payment of his rent, the landlord may pursue this remedy, and it cannot be said that the tenant has paid or tendered the rent due if he had deducted even a valid cross-claim. So rights may be lost under a conditional sale or a mortgage by non-payment though the creditor owes the debtor on another account a greater amount than that due him."

Thus under some circumstances a tenant would be required to pay the rent

or lose his rights to the property under the lease although the landlord owed him more money than the amount of the rent. This possibly would not be so if it were undisputed that there was presently due and owing from the landlord to the tenant more money than the amount due and owing by the tenant on the rent and the tenant definitely claimed the right to offset one claim against the other.[1] However, we do not have to decide that question for the facts here are different. The amount, if any, of the tenant, King's claim against the landlord was in dispute and the tenant did not claim an offset but claimed that no rent was owing. Under these circumstances King lost his right to the property under the lease for failure to comply with its terms.

The court found that at the time the notice of termination was served on King he owed $87.10 as rent and at the time of the trial there was due $242.25. The lease provided that if the rent remained unpaid for a period of 20 days after it became due or if default were made in any of the covenants by the lessee it would be lawful for the lessors to re-enter and take possession of the property without notice or legal process. Ordinarily unless a lease specifically so provides, failure to pay the rent does not automatically terminate it and there must be a proper demand for its payment, but this demand may be waived by an express provision in the lease. See 32 Am.Jur., Landlord & Tenant, Sections 855 and 856. The provision that the lessors had the right to re-enter and take the property without notice or legal process must mean therefore that the right to a demand for the payment of the rent before a termination could be declared was waived by the lessee, if we are to give any meaning or import to those words, since the lease does not provide for its automatic forfeiture for failure to pay rent or breach of any of the covenants. However, even if the notice of "termination of lease" served on King was an unequivocal act evidencing the landlord's election to terminate the lease, *it does not follow that without King's consent* and during his absence they could rightfully enter and dispossess him. Utah has enacted Forcible Entry and Detainer Statutes and a landlord may not without the express consent of a tenant repossess his property without resorting to remedies provided in those statutes. See Buchanan v. Crites, 106 Utah 428, 150 P. 2d 100, 102, 154 A.L.R. 167, where it is said:

"Most American jurisdictions, including Utah, have enacted Forcible Entry and Detainer Statutes. In states having such statutes the prevailing view is that 'a landlord who is entitled to possession must, on the refusal of the tenant to surrender the

---

1. See White v. District Court, Utah, 232 P.2d 785, where we allowed a counterclaim for damages to an action for un-

lawful detainer under Rule 13, Utah Rules of Civil Procedure.'

premises, resort to the remedy given by law to secure it.' 45 A.L.R. 313, 316. If the landlord, contrary to the terms of such a statute enters by force without resort to legal process, he is by statute made civilly liable to the dispossessed tenant. We held in Paxton v. Fisher, 86 Utah 408, 45 P.2d 903, 906, that under the Forcible Entry and Detainer Statutes, 104–60–1, ff. U.C.A. 1943: 'Even rightful owners should not take the law into their own hands and proceed to recover possession by violence, or by entry in the nighttime, or during the absence of the occupants of any real property.' "

■ From what we have said it follows that if King had proved any substantial damages which were the natural and proximate result of respondents' wrongful act he should have been granted a judgment for such damages. King's lease having been rightfully terminated before respondents' wrongful entry, he by continuing to remain in possession was holding over wrongfully after being notified in the "termination notice" to quit the premises immediately, 32 Am.Jur., Landlord & Tenant, Sec. 918. King's rights in his lease having been terminated and his possession thereafter wrongful, the only damages he would be entitled to would be those which would naturally result from the wrongful taking of possession by the respondents. King failed to prove any such damages.

■ The Forcible Entry and Detainer Statute was enacted for the primary purpose of preventing disturbances of the peace brought about through self-help in the matter of dispossession.

■ A landlord who is entitled to possession must, on the refusal of the tenant to surrender the premises, resort to the remedy given by law to secure it. Buchanan v. Crites, supra. There is no question under Utah cases that a violation of the duty set by the statute gives rise to an action for damages, not in an action under the Forcible Entry and Detainer Statute but as a separate tort. However, there is some conflict as to whether or not nominal damages should be awarded where no actual injury was sustained and the person ejected was not entitled to possession. Cf. Buchanan v. Crites, supra, and Paxton v. Deardon, 94 Utah 149, 76 P.2d 561; Larsen v. Knight, Utah, 233 P.2d 365.

■ Appellant King could have brought action under the Forcible Entry Statute to regain possession of the property and damages incidental to his ouster; but he did not choose that remedy. The statute places a duty upon any person, whether entitled to possession or not, not to use force or stealth or fraud in gaining possession of realty. Correspondingly, it creates a right in the person in actual peaceable possession not to have his possession disturbed other than by legal process. Therefore, regardless of his lack of entitlement to the

property, King had a cause of action for the invasion of that right. Since he proved no actual damages, he should be awarded nominal damages of one dollar to preserve the right. Page v. De Puy, 40 Ill. 506.

■ Appellant King claimed damages for failure to comply with .the terms of the lease to furnish ·sufficient water to operate Frosty Freeze business because except for a few months in 1951, there never was sufficient water to operate the soft ice cream machines efficiently with the resultant damage of about $7.50 per day. The lease which was prepared by King's attorney shows the premises were let for the "purpose of conducting a refreshment business, furnishing sandwiches, hot dogs, soft drinks, beer, candy, cigarettes and novelties." There is no mention of soft ice cream or any kind of ice cream in the lease even though the evidence showed the parties discussed the sale of that product before the lease was written and King knew of the scarcity of water in the vicinity. There was evidence that sufficient water was supplied for a refreshment business of the kind described in the lease. The court therefore did not err in failing to find respondent liable for damages for failure to supply sufficient water to operate the soft ice cream machines or in failing to find that they had breached their covenant to furnish sufficient water.

King alleged a conversion by respondents of his property in the Frosty Freeze premises. The evidence is undisputed that respondents padlocked the premises and refused to allow King to re-enter for the purpose of getting any of his personal property. However, under the terms of the lease, the lessors had a first lien upon the furniture, fixtures and personal property of the lessee for unpaid rent. A meager attempt was made to show that the lessors had used the property for their own purposes, but the proof falls short. An employee of both parties testified that some of the equipment used on the premises when King was in possession was also used after the respondents took over the business. Just what equipment or to whom it belonged was never brought out. The respondents admittedly owned outright some of the property and certain other pieces were represented by the debt of $346 discussed above. The trial court found that:

"The evidence does not show whether or not the defendants have used the equipment or personal property left by plaintiff on the premises."

The judgment is modified to allow appellant $1 nominal damages for the forcible entry made by respondents upon property which he held in actual possession and $346 for the debt owing him by respondents. The trial court recognized and continued by its judgment the lien of respondents upon appellant's property. Since we hold that he has owing him more than the amount of rent due the judgment after deducting the rent from the judgment for appellant, should allow for the release of the lien on

428

that property. As so modified, the judgment is affirmed. Each party to bear his own costs.

McDONOUGH, C. J., and CROCKETT, HENRIOD, and WORTHEN, JJ., concur.